Combe v. Wolff

1

```
1              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
2                  ALEXANDRIA DIVISION

3    --------------------------------x
                                     :
4    COMBE INCORPORATED,             : Civil Action No.
                                     :
5                   Plaintiff       : 1:17-CV-935
                                     :
6              versus                :
                                     :
7    DR. AUGUST WOLFF GMBH &,        :
     CO. KG ARZNEIMITTEL,            :
8                                    :
                    Defendants.      : August 31, 2018
9    --------------------------------x

10          The above-entitled Motions Hearing was continued
     before the Honorable T.S. Ellis, United States District Judge.
11
                      A P P E A R A N C E S
12
     FOR THE PLAINTIFF:
13
              ANNA BALISHINA NAYDONOV, ESQ.
14            DOUG REHEW, ESQ.
              Finnegan Henderson Farabow Garrett & Dunner LLP
15            901 New York Ave NW
              Washington, DC 20001-4413
16
     FOR THE DEFENDANT:
17
              MICHAEL ABBOTT GROW, ESQ.
18            ROSS PANKO, ESQ.
              Arent Fox PLLC
19            1050 Connecticut Ave NW
              Washington, DC 20036-5339
20


21       OFFICIAL UNITED STATES COURT REPORTER:

22            MS. TONIA M. HARRIS, RPR
23            United States District Court
              Eastern District of Virginia
24            401 Courthouse Square
              Ninth Floor
25            Alexandria, VA 22314
              703-646-1438
```

2

1              **P R O C E E D I N G S**

2    (Court proceedings commenced at 10:34 a.m.)

3              THE DEPUTY CLERK:  Combe Incorporated versus Dr.

4    August Wolff GMBH & Co. KG Arzneimittel.  Civil Case No.

5    1:17-CV-935.

6              Counsel, please note your appearance for the record.

7              MR. REHEW:  Good morning, Your Honor.  Doug Rehew

8    from Finnegan on behalf of Combe.

9              THE COURT:  All right.  And on behalf of the

10   defendant.

11             MR. PANKO:  Good morning, Your Honor.  Ross Panko

12   and Michael Grow from Arent Fox on behalf of Dr. Wolff.

13             THE COURT:  All right.

14             MR. REHEW:  I also have Anna Naydonov with me as

15   well.

16             THE COURT:  All right.  Good morning to all of you.

17             All right.  Let me recount roughly where we are

18   here.  This is a Section 1071 of Title 15 case in which an

19   unsuccessful protestor before the TTAB opposing the issuance

20   of a trademark by this defendant brought this 1071 suit.

21   There has been in the past some confusion about 1071 cases.

22   I've been here long enough so that I participated in some of

23   that confusion.

24             In fact, in a recent flurry of mail that I received,

25   bags of it, castigating me and praising me, I received a

Combe v. Wolff

3

1   letter from a woman who didn't do either castigate or praise

2   me, but reminded me that she had been in high school with me

3   in 1956 in Greenwich High School in Greenwich, Connecticut.

4   And her message to me was, "I'm glad to see you're still

5   kicking."  I wish I could have said the same to her.  I didn't

6   remember her.

7           In any event, there has been confusion.  But as a

8   result of the *Swatch* case in the Fourth Circuit there is no

9   longer much confusion about the process.  Given the fact that

10  the parties have now gone through discovery, they're amassing

11  a record.  I've issued an order requiring the administrative

12  record to be sent and filed here.  And the parties, as I've

13  said, have also presented additional evidence.  And so *Swatch*

14  teaches that a review under 1071 is a de novo review of the

15  entire record.  No differential review to what the TTAB did.

16  It is a de novo review of the entire record.

17          Now, the defendant's briefs have continued

18  relentlessly to say jury trial is demanded.  I don't believe

19  there is an entitlement to a jury trial in this matter.  I

20  don't know how a jury would review an administrative record.

21  De novo or otherwise.  But let me confirm.

22          Does the plaintiff contend there is a jury in this

23  case?

24          MR. REHEW:  No, Your Honor, and I believe in our

25  last appearance before Your Honor we -- the parties agreed

1   there will be no jury.

2             THE COURT:  Is that correct?

3             MR. PANKO:  That's correct, Your Honor.

4             THE COURT:  All right.  Well, that eliminates one

5   thing, because I went back to a 1951 case to determine that

6   the origins of 1051 are in equity.

7             So I anticipate that after a trial I will have a

8   complete record and I will have to review that entire record

9   and develop findings in fact and conclusions of law that focus

10  on whether the TTAB was correct in issuing the Vagisan mark.

11            Now -- so the question is:  Should the defendant's

12  mark, Vagisan, which -- should it not have issued or should it

13  be cancelled, one way or the other.  It should be cancelled

14  because it has issued.  That's really the contention.

15            Now, there are three motions before the Court today.

16  A Daubert motion and two evidentiary motions.  I think, given

17  that the parties are correctly in agreement that this is not a

18  jury matter and that they are correctly in agreement that this

19  is a review de novo, so I have to consider the trial record as

20  well.

21            And the three motions are:  a motion to exclude

22  evidence of various third parties, and a motion to exclude or

23  strike or exclude plaintiff's expert, and a motion -- what's

24  the third one?  It's -- the third one is a motion to exclude

25  Dr. Simonson's opinions regarding the use of foreign packaging

—Combe v. Wolff—

5

1   for likelihood of confusion survey.  Those are the three

2   motions, which I will hear from you on today.  But I'm also

3   interested today in setting a date for a hearing on the

4   merits.  This matter has been pending too long now.  We need

5   to get it resolved.  Maybe if I delay it long enough Combe

6   will buy Wolff or Wolff will buy Combe and we wouldn't have to

7   worry about this.  But I take it that's not in the offing, is

8   that correct?

9           MR. REHEW:  That's correct, Your Honor.

10          MR. PANKO:  And just to clarify, Your Honor, we do

11  have a trial date.  We had the pretrial conference on August

12  16th.

13          THE COURT:  That's right.

14          MR. PANKO:  And the Court set the trial date for

15  December 4th.

16          THE COURT:  What did I set?

17          MR. PANKO:  December 4th, Your Honor.

18          THE COURT:  All right.

19          MR. PANKO:  And, Your Honor, you also instructed the

20  parties to contact a magistrate judge to set -- arrange for a

21  settlement conference, which we have done and we've conferred

22  with dates and contacted --

23          THE COURT:  All right.  Thank you.  Let's take up

24  first the attack on plaintiff's survey for not using

25  defendant's foreign packaging.  I guess that's what that is.

6

1   So that would be -- that would be the plaintiff's motion.

2           Is that correct?

3           MR. REHEW:  Yes, Your Honor.

4           THE COURT:  I'll hear from you first on that.

5           MR. REHEW:  Thank you, Your Honor.

6           Your Honor, as you note, 1071 appeals are a bit

7   unusual.  They are not very common in the trademark context.

8   But what's really unusual is to have a 1071 appeal that

9   doesn't have an infringement claim to it.  Most of the time

10  people -- a party will appeal from the board and that when

11  they go to District court they'll --

12          THE COURT:  If we delay long enough maybe Wolff will

13  come into the market.

14          MR. REHEW:  But to Your Honor's point they are not

15  here and that's a very important point here.  But we look for

16  cases where there were appeals from 1071 with no infringement

17  claims.  There is very, very few.  And there's very few that

18  talk about the surveys, but we found two of them.

19          THE COURT:  Very few that what?

20          MR. REHEW:  That actually involve consumer surveys,

21  the likelihood of consumer surveys, Your Honor.  And we found

22  two cases.

23          One of them is the *Seacret Spa* case, which is in

24  this court.  And the other case is a case in the southern

25  district of New York.  And we did cite those in our papers.

Combe v. Wolff

7

1    It's on page four of our reply.

2            But the *Seacret Spa* case is a very instructive case.

3    That's a case out of this court.  And there was a case where

4    there was an appeal about a TTAB decision to this Court under

5    1071 and there, there was a survey at issue.  And in that

6    case, Judge Cacheris explained that when you're looking at a

7    1071 appeal without an infringement claim, the use of a

8    trademark in the marketplace is irrelevant.  It has no

9    relevance at all.  And the court explained that in this

10   context, in the registration context, all you look at is not

11   the actual use of the mark in commerce, but you look at the

12   trademark application that was refused.  And that application

13   defines the issue in the case.

14           Because what you're talking about is --

15           THE COURT:  How does that square with the *Swatch*

16   case?

17           MR. REHEW:  Well, the *Swatch* case involved

18   infringement.

19           THE COURT:  I understand that, but even without

20   infringement, isn't the 1071 case a new trial?

21           MR. REHEW:  Yes.  Absolutely.  Procedurally it's a

22   new trial.

23           THE COURT:  So why can't I look at anything that

24   might be relevant in determining whether the TTAB should have

25   issued a mark or a mark should be cancelled?

Combe v. Wolff

8

1          MR. REHEW:  Your Honor, you absolutely could look at

2    any new evidence that would be relevant to that determination,

3    but the actual use of their mark is not relevant.  And this

4    Court has held that.  That the actual use -- how they actually

5    use the mark in commerce is not relevant because all we're

6    looking at is whether the mark should have registered.  And

7    when you look at that issue, it's -- all you determine is the

8    mark in the application and the goods in the application.

9          And that applies here to this motion, because Wolff

10   is criticizing Combe for doing a survey that didn't show an

11   actual product.  And our view is we did the survey the

12   absolute way you're suppose to do it when you're looking at a

13   registrability determination.  And that was what was at issue

14   in *Seacret Spa* when this Court was looking at it.

15          And the Court held that --

16          THE COURT:  Was that before or after *Swatch*?

17          MR. REHEW:  That was after *Swatch*, Your Honor.  That

18   was actually a 2016 case.

19          THE COURT:  All right.  Go on.

20          MR. PANKO:  So it was after *Swatch* and the Court --

21   this Court said, and I quote, "The relevant inquiry in a

22   registration proceeding involves the mark and usage described

23   in the application rather than as they appear in the

24   marketplace."

25          And so for that reason --

1          THE COURT:  See the problem I have with that is that

2   1071 is a new case.  It's a court case.  And do you have any

3   authority apart from that case that says that the scope of

4   review in a 1071 case is limited to the kind of evidence that

5   would be considered on a registration and it can't be

6   furthered than that?

7          See that doesn't make much sense to me if you can

8   say that, as *Swatch* says, you can produce all kinds of

9   evidence in a 1071 case.  But now you're saying no you can't.

10         MR. REHEW:  Your Honor, the difference between

11  *Swatch*, is *Swatch* had an infringement claim.  So when you're

12  looking at infringement, you're looking at the actual use of

13  the mark.  But when you're looking at a registrability

14  determination without infringement, the sole issue is whether

15  the mark should be:  Application, has applied for, should have

16  gone through.

17         And so when you're looking at trademark application

18  it doesn't have things like the house marks or how the

19  packaging looks or all the other things you would see in

20  actual commerce.  So those are irrelevant.

21         And an answer to Your Honor's question, we also

22  cited the *Victoria Secret* case out of the southern district of

23  New York on page four of our reply.  And that was another case

24  where it was an appeal of a 1071 case, went to district court,

25  and the Court held there that it was appropriate to do a

—Combe v. Wolff—

1    consumer survey where you just showed people the mark as typed

2    out for the goods and services as they were applied for.

3          And the issue in this motion is:  Is it acceptable

4    to do a consumer survey where you just show people the mark as

5    it appears in the trademark application, not as it appears in

6    use.  And there's -- the legion of case law says when you're

7    before the Trademark Trial and Appeal Board -- the issue that

8    we're appealing, and we cited a number of pages on pages 8 and

9    9 of our main brief -- case after case before the Board says

10   you only look at the mark as registered or as applied for.

11   You don't look at extraneous things like the use of the mark.

12   And that's critical for this because the only issue we have

13   here is the registrability, the appeal of the registrability.

14   It's not an infringement case.

15          And so under *Swatch* -- and again *Seacret Spa* was

16   post-*Swatch* and was cognizant of the standard of review of

17   *Swatch*.

18          THE COURT:  What would have been controlled by

19   *Swatch* whereas the case out of here wouldn't have been

20   controlled by *Swatch*?

21          MR. REHEW:  Well, *Swatch* doesn't -- *Swatch* doesn't

22   say -- because *Swatch* was dealing with an infringement issue,

23   it does not say that we were dealing with a 1071 appeal

24   without infringement that you only look at the issue of

25   registrability.

Combe v. Wolff

1           THE COURT:  You're quite right.  But it doesn't say

2   the opposite either.

3           MR. REHEW:  Correct.  Because that wasn't at issue,

4   Your Honor.

5           THE COURT:  It wasn't at issue, you're right, but

6   the language in *Swatch* certainly suggests that once you file a

7   1071 it's a new ball game.  Not only for infringement but for

8   registration as well.  But I understand the point you're

9   making.  It is a central point.

10          What else can you cite to me that supports your

11  position?

12          MR. REHEW:  Well, Your Honor, all the cases that --

13  and again, in your brief we've got those two cases that we

14  talked about, the 1071 appeals.  The *B&B Hardware* case out of

15  the Supreme Court talks about the difference between

16  registrability determinations and infringement cases and that

17  was relied upon in the *Seacret Spa* case.

18          And all of the cases that Wolff cites in their

19  briefs are all infringement cases.  And the key here is that

20  there's -- there's two different issues.  There's infringement

21  and there's registrability.

22          And this court has already held there's no

23  infringement claims here.  The Court has held this is solely

24  registrability because Combe tried to add infringement claims

25  but they were denied.  And this Court held there can be no

Combe v. Wolff
12

1   infringement claim because Wolff is not using the mark in

2   commerce.  They're not -- they're not making a product.

3          Now, another fundamental point here is Wolff says

4   well we should have used their foreign packaging in our

5   survey.  That would be inappropriate because Wolff has

6   testified over and over that it does not know what its U.S.

7   packaging will look like.

8          THE COURT:  All right.  Let me hear from the other

9   side on this point and we'll move on to the next one.

10         ATTORNEY 1:  Your Honor, we have one fundamental

11  disagreement here.

12         THE COURT:  Just one?

13         ATTORNEY 1:  Well, there's more than one but one

14  really important one.  And that is this isn't a situation that

15  is determined by whether we're dealing with infringement or

16  registrability.  Whether if you're in an infringement case or

17  a case before the TTAB, you're looking at likelihood of

18  confusion.  And the survey that they did is a likelihood of

19  confusion survey.  There's nothing in *Swatch*.  There's nothing

20  in any other case that I know of that says when you go from

21  the TTAB to a federal court and you're doing a trial de novo,

22  that you're somehow prohibited from offering the best evidence

23  possible on the issue of confusion.  And in this case it's

24  very clear that they have not done that.  They did a survey in

25  which they merely showed respondents the names:  Vagisil and

Combe v. Wolff

13

1    Vagisan typed on index cards.  Nobody in the marketplace is

2    ever going to have that scenario --

3          THE COURT:  I understand the criticism but that --

4    you're going past the point of whether or not that criticism

5    should even be considered.  They say it shouldn't.  And so

6    nevermind -- I take your point that if you don't have the

7    commercial circumstances it lessens the probe of the -- the

8    probative value of anything, because it isn't in the

9    marketplace.  But their argument is that you don't do that for

10   registration that their survey focuses only on the

11   registration and what you would see.  And they cite two cases

12   where court's, following *Swatch*, one of them being controlled

13   by *Swatch*, limited -- apparently limited the evidence to what

14   would be done on the registrability, not on anything broader

15   than that.

16         ATTORNEY 1:  Not exactly correct, Your Honor, if I

17   may.  The *Seacret Spa* case didn't even involve a survey.

18   That's a case from Judge Cacheris.  In that case Judge

19   Cacheris said that he agrees that the -- the witnesses

20   reliance on marketplace usage and his failure to produce a

21   survey of any kind limits the probative value of his

22   testimony.

23         And I submit to you that using an index card only

24   survey limits the probative value of the evidence that the

25   Court is going to see when it does a trial de novo.

Combe v. Wolff

14

1        THE COURT:  All right.  I think I understand that

2   argument too.

3        ATTORNEY 1:  And the reason that's important, Your

4   Honor, our client uses this same package all over the world.

5   This is the one that's sold in the UK and some gray-market

6   people have shifted into the U.S.

7        Our client testified that it's waiting to see what

8   this Court does.  If this Court finds, based on this

9   inadequate index card survey that the TTAB should be reversed,

10  that's still doesn't resolve the issue of confusion.

11       THE COURT:  I don't think I reversed the TTAB.  What

12  I do is I either cancel the mark or I don't.  The mark has

13  issued, hasn't it?

14       ATTORNEY 1:  No, Your Honor.  In this case there's

15  only an application that was opposed.

16       THE COURT:  So they didn't issue a mark yet?

17       ATTORNEY 1:  They haven't issued a registration.

18  There was an opposition in which it was argued that there is

19  confusion.  The TTAB found no confusion because going through

20  all of the factors --

21       THE COURT:  Yes, I read all of that.

22       ATTORNEY 1:  Yeah.  So it -- I guess Your Honor

23  would either allow the application to go forward to

24  registration or it would instruct the TTAB to say --

25       THE COURT:  All right.

1        ATTORNEY 1:  -- the opposition is sustained.  My

2   point is this, Your Honor, even if you do that that's not the

3   end of this story.  It might be the end of the story if

4   they've done a proper survey based on what's really in the

5   marketplace, but if my client is told you can't register

6   Vagisan by itself, despite the fact that the TTAB found

7   there's --

8        THE COURT:  I think I --

9        ATTORNEY 1:  -- it can start over.

10       THE COURT:  I think I've got the parties' arguments

11  pretty clearly in mind.  One side says you're limited to what

12  would be presented to the TTAB for registration purposes only.

13  The other party says, no you can present more, but it only

14  goes to the criticism that you didn't use trade dress only

15  goes to the value, the probative value.  Is that right?

16       ATTORNEY 1:  It goes to the probative value of the

17  survey, but it also goes to the whole question of likelihood

18  of confusion.

19       In the other case that they mentioned the *Victoria*

20  *Secret* case, the expert there did both an index card survey

21  and a survey based on trade dress, marketplace realities.  And

22  in fact, only half as many people showed confusion when they

23  saw the actual product in the marketplace.

24       So our contention is, Your Honor, there is nothing

25  that prevents them from putting in any kind of evidence they

Combe v. Wolff

16

1  want.  And if they really wanted to prove that there's

2  confusion, they should have used the best evidence available.

3  They didn't do that and therefore this motion, which is trying

4  to exclude an expert from opining on this, should be denied.

5  He should be permitted to give his opinion on the value of

6  having marketplace conditions taken into account in a survey.

7          THE COURT:  All right.

8          MR. REHEW:  Your Honor, may I --

9          THE COURT:  Yes, you may respond briefly.

10          MR. REHEW:  Very few points briefly.  Your Honor,

11  that product is not used in the United States.  It is not used

12  all over the world.

13          THE COURT:  He didn't say otherwise.

14          MR. REHEW:  Well, he did say it's used in the

15  market.  And they --

16          THE COURT:  Used in the market in Europe.

17          MR. REHEW:  In Europe.  But they were in emphatic --

18  Wolff was emphatic to this Court saying --

19          THE COURT:  Yes, they don't contest that now.  I

20  issued an opinion on that.  It's over.

21          MR. REHEW:  But what's critical is they said they

22  can't do a survey with that packaging.  They told the Court

23  that.  And it's in our briefs.  They told the Court a survey

24  can't be done with that packaging.  And so now they're saying

25  it should be done.

Combe v. Wolff

1          THE COURT:  No, I'm going to determine whether they

2    can do it or not.  What they say isn't going to move me.

3          What else do you have?

4          MR. REHEW:  This Court's -- well, two things, Your

5    Honor:  In *Seacret Spa* this Court did consider a -- what was a

6    study of the use of the mark based upon the marketplace uses,

7    which appears in the opinion to be a survey.  The Court said

8    that that was of limited value because that's not the issue in

9    this case and over and over the Court did say, it's very

10   relevant to this, the marketplace uses are irrelevant in this

11   type of appeal.  And that's what this Court said.

12         THE COURT:  All right.

13         MR. REHEW:  And finally, the *New York* case did have

14   two surveys but that's because the product wasn't used in the

15   United States.  And the Court held it was totally and entirely

16   proper to do the index card survey, like we did here.  And

17   that's the issue here, whether that's appropriate.  And based

18   on all the authorities for this type of case it certainly is.

19         THE COURT:  All right.  Let me hear your argument on

20   the motion to exclude evidence of various third parties.

21         If you file enough motions, would I eventually get

22   to hear from Ford Farabow?  I take it the answer to that

23   question is no.

24         MR. REHEW:  It would take a few more motions, Your

25   Honor.

Combe v. Wolff

18

1          THE COURT:  And how would you get him off the golf

2    course?

3          MR. REHEW:  That's something I was never able to do,

4    Your Honor.

5          THE COURT:  Mr. -- for your benefit, this firm and I

6    were locked in mortal combat in the '70s.  Mark Finnegan was

7    then the head of it.  I was on the other side.  We took the

8    deposition -- at my age you reminisce a lot as the newspapers

9    have noted and the commentators.

10          So we took the deposition in a patent antitrust case

11   of the defendant -- yes, no, the plaintiff's CEO and the

12   deposition lasted six weeks.  Now, anybody who does that in

13   this court is going to get prison sentence.  Serious sanction.

14   But I -- I was different then.  And the deposition took place

15   in the South of France.  So that explains it, doesn't it?

16          And during that whole lawsuit I got to know Mark

17   Finnegan and Ford Farabow.  That's why I raised it.  Mark

18   Finnegan passed away a number of years ago prematurely

19   tragically.  And then -- I'm revealing all of this because I

20   don't think it really amounts to recusal.  There was some

21   event at which you-all invited speakers and then you gave

22   awards, a Mark Finnegan award to a speaker.  I think I got one

23   of those 15 years ago or so.  I don't know what I've done with

24   it.  But I want you to pass my regards on to Mr. Farabow.  I

25   don't know anyone else in the firm.  And I -- I lament the

Combe v. Wolff

19

1    passing of that era.  These were -- four of us locked in

2    mortal combat and we became good friends.  How often does that

3    happen these days?  That's too bad.

4            The case was ultimately settled.  I can't remember

5    now if anybody could claim advantage from the settlement.  But

6    in any event, we were always civil to one another.  And that

7    doesn't happen as much today as it happened in the '60s and

8    '70s, which occurred back then.

9            In any event, I want to hear about this so-called

10   irrelevant third party.

11           This has to do with the prefix Vag, is that right?

12           MS. NAYDONOV:  Yes.  With the prefix Vagi, Your

13   Honor.  Wolff wants to rely on a number of third party marks

14   to argue that they allegedly diminished.

15           THE COURT:  There was some evidence of that before

16   the TTAB.

17           MS. NAYDONOV:  There are some products that they

18   purchased before the TTAB.

19           THE COURT:  In fact the TTAB noted that a lot of

20   people used Vag and it's asking too much -- or it's not asking

21   too much that they distinguish between sil, sans, care, and

22   all sorts of other suffixes to the prefix Vag.  Is that right?

23           MS. NAYDONOV:  Well, actually, Your Honor, the TTAB

24   did not know that there were a lot of third parties.  They

25   said that there were some.  There were 14 registrations.

Combe v. Wolff

20

1          THE COURT:  Right.

2          MS. NAYDONOV:  And they said there's no evidence of

3    how widely they're used.  So despite the numerous repetition

4    in our opponents brief that the TTAB --

5          THE COURT:  So why should I ignore this -- this new

6    evidence, which is really just quantitatively different from

7    what was before the TTAB?  It's the same evidence.  It's just

8    quantitatively greater.

9          MS. NAYDONOV:  It's quantitatively a little bit

10   greater, but we're still talking about a very small handful of

11   marks, which are irrelevant because this case is not about who

12   owns the Vagi prefix.  If that was the case, that we are

13   alleging that we own Vagi and that's why we are here those

14   would be irrelevant, but that's not the case.  This is a case

15   about Vagis, plus one vowel and one constant:  Vagisil,

16   Vagisan.

17          So all of these small third parties we're talking

18   about, I think 22 total -- we did a summary chart for the

19   Court's convenience in their reply brief -- they all combine

20   Vagi with very distinct terms.  Like Vagipur, Native remedies,

21   Vagi-Clear.  So -- and all of those marks, as we detailed

22   virtually all of them, have just laughable sales of like zero

23   to a couple of thousand dollars a year, no advertising

24   spending.

25          THE COURT:  Why doesn't that go to weight rather

Combe v. Wolff

21

1    than admissibility?

2          MS. NAYDONOV:  Because they are irrelevant, Your

3    Honor.  They did not --

4          THE COURT:  That doesn't give me a reason.  That

5    answers -- why is it irrelevant rather than merely go to the

6    weight?

7          MS. NAYDONOV:  Because they're so different that

8    they cannot diminish the strength of the Vagisil brand.  Just

9    on their face Your Honor can see that the marks they're trying

10   to rely on are different.  And also on their face the

11   declarations is what you'll hear at trial about the uses of

12   those third parties and with the exception of private label

13   that I will get to, they are just so small that as a matter of

14   law they are insignificant and it would be a waste of time to

15   go over them again at trial.

16         THE COURT:  Well, you finally said something that

17   got my attention, "waste of time."

18         Let me ask the defendant here.  Suppose I conclude

19   that these registrations using "Vag" may have some probative

20   value if they are significant enough.  Surely that would slim

21   down what you would offer.  Am I correct?

22         MR. PANKO:  Well, Your Honor, just to briefly to

23   answer your question and to --

24         THE COURT:  How about answering it first?

25         MR. PANKO:  Well, Your Honor --

Combe v. Wolff

22

1          THE COURT:  The answer is yes.

2          MR. PANKO:  The answer is yes Your Honor.  What we

3   would offer at trial would be 17 -- at least 17 third-party

4   uses of trademarks that used the --

5          THE COURT:  How would you do that?

6          MR. PANKO:  We have -- as Combe mentioned, we have

7   declarations from ten of these --

8          THE COURT:  But this is the trial.  Wouldn't they

9   get to cross-examine those people?

10          MR. PANKO:  Combe has stipulated that these

11   declarations are admissible in this case.

12          THE COURT:  All right.  So all you would do would be

13   to introduce 17 registrations.

14          MR. PANKO:  We have 17 uses of the Vagi prefix or

15   vaginal care products and 18 live registrations of --

16          THE COURT:  How would you show the former?  The

17   registrations you would simply submit.  And they are either

18   authentic or uncontested or not.  How would you show the

19   other?

20          MR. PANKO:  With regards to the registrations, we

21   have a paralegal who printed the documents, the registrations

22   from the PTO website.

23          THE COURT:  I don't want to hear from any paralegal.

24          MR. PANKO:  And these are public records.

25          THE COURT:  There you go.

Combe v. Wolff

23

1          MR. PANKO:  These are public records.

2          THE COURT:  All you need is a request to admit or

3    something of that sort.  But how would you prove the others?

4          MR. PANKO:  The others, as I mentioned, we have

5    declarations from these third party --

6          THE COURT:  How is that admissible at a trial?

7    They're hearsay.

8          MR. PANKO:  We have a stipulation from Combe that

9    these are documents that are genuine and that these parties in

10   fact sold these products under the Vagi prefix in the United

11   States.

12         THE COURT:  All right.  Now, surely some of them, as

13   Combe points out -- by the way, is it Combe or Combe?

14         MS. NAYDONOV:  Combe, Your Honor.

15         THE COURT:  Combe.  As Combe correctly points out

16   some of these are pretty de minimis commercially.

17         Why are those relevant?

18         MR. PANKO:  Those are relevant, Your Honor, because

19   under the *Juice Generation* case from the federal circuit and

20   the *Jack Wolfskin's* case from the federal circuit no evidence

21   that the amount of sales is required where you have a

22   substantial number of third party marks, which we have here.

23         In fact, in *Juice Generation* and *Jack Wolfksin* the

24   federal circuit overturned the -- reversed the TTAB decision

25   where the TTAB found, as Combe is arguing the Court should do,

1  to find that third-party marks shouldn't be considered if

2  there are no details regarding the sales.  Federal circuit in

3  both of those cases said that's wrong.  That's not the right

4  approach.

5          What you do is you look at the overall landscape.

6  Are there a significant number of descriptive prefix marks

7  being used, other significant number that has been registered.

8  Here, as the TTAB correctly found and as our evidence

9  confirms, there is.  There's a significant number of uses and

10 registrations.  Therefore what the TTAB found is imminently

11 correct and we will prove that at trial.

12          THE COURT:  All right.  Let me switch for a moment,

13 because I want to come back to other things, but let me switch

14 for a moment to the issue of plaintiff's expert Hal Poret.

15          You have a motion to exclude that.  Let me hear from

16 you on that.  You argue that Mr. Poret's likelihood of

17 confusion survey doesn't consider market conditions.  Is that

18 what I've already heard?  Is that the argument that I've

19 already heard?

20          MR. GROW:  That's not the main argument.  That's one

21 of the arguments, Your Honor.  I can tell you the main

22 argument of why this should be excluded.  And that is that

23 this survey, unlike any one I've ever seen, has a blatant

24 misrepresentation of the reported instances of confusion.

25 There is one respondent, No. 1764, who was allegedly confused

1    and put in the test group.  And when you go to the verbatims

2    you find that when he was asked:  What company or brand puts

3    that out, he said Vagipur.  Vagipur was the control.  There's

4    only two ways that can happen.  Either somebody deliberately

5    skewed the survey to try to make it more favorable for Combe

6    or it was done so sloppily that it just can't be relied upon.

7            If I went home tonight and bought a carton of eggs

8    and had one for breakfast and came down with semolina

9    poisoning, I wouldn't go test the rest of the eggs in that

10   carton, I would throw it away.  And that's what has to be done

11   with this survey.

12           This never happens in a survey.  The first

13   responsibility of a survey expert is to make sure that the

14   results are reported accurately.  And he was either

15   extraordinarily careless or something deliberately was done

16   here in any event.  You can't rely on a survey like this.

17           The other important reason to take this into or to

18   consider here, there's another survey respondent, No. 1330 who

19   when they were asked who put this is out, they said -- she

20   said "Vagisan," which was the appropriate response.  It was a

21   Vagisan product she saw.

22           Two questions later, when finally asked who is

23   affiliated or connected with this, she said first Monistat.

24   And when we looked at this initially with this big wide print

25   out, we thought well they reported that one wrong too.  But

26

1   then after saying "Monistat" she said "Vagisil."  They

2   reported that as confusion too.

3           And there are many instances in here where

4   respondents who were asked why they gave a particular answer

5   explained that it wasn't because they were confused, some of

6   the time it was because of the Vagi prefix.  And here is

7   really the important point, Your Honor.  When you pick a

8   trademark with a descriptive or generic prefix and then add

9   something to the end of it, you don't get to accuse somebody

10  for confusion if they use the mark that has that prefix.  The

11  mark as a whole has to be confusing.  The Court has to look at

12  the suffix to determine.

13          This is a very common situation in trademark law.

14  The first trademark case I ever worked on was for Johnson &

15  Johnson.  They had a mark called Permacel.  They had filed six

16  cases trying to prevent other people from using "Perma" with

17  some different suffix than "cel."  They lost every one of

18  them.  They turned to us for the seventh.  We lost that one

19  too.  And the Board has ruled over and over again if somebody

20  picks a descriptive prefix, they can't monopolize that word.

21          And in this case that's what happened.  And many of

22  the people who were reported as confused in this survey were

23  confused only because of that prefix.  This is what's known as

24  the "crowded field doctrine" when you have a field of use

25  that's so crowded with third-party uses, you can't count that

27

1 | as confusion.  That's the big flaw in this survey.  In

2 | addition to --

3 |       THE COURT:  Why doesn't this go to the weight of --

4 | that I described in the survey rather than to kick it out

5 | entirely.

6 |       MR. GROW:  Well, Your Honor, that's entirely your

7 | call, of course.  We think, as I mentioned at the outset, it's

8 | so unreliable it should be kicked out entirely.  But even if

9 | you accept it, this reason alone is enough to give it

10 | virtually no weight.  No weight whatsoever.

11 |       THE COURT:  All right.

12 |       MR. GROW:  The other thing -- the reason that this

13 | survey contained why questions was specifically to find out

14 | whether people were being confused by that Vagi prefix or not.

15 | This is not a normal trademark survey.  Most surveys aren't

16 | from this crowded field.  They don't have these descriptive

17 | prefixes, but this one did.

18 |       But ordinarily, if you do a survey properly in

19 | addition to asking these why questions, you have to use a

20 | proper control.  And that control has to be non-infringing but

21 | close enough to the plaintiff's mark where they can

22 | effectively screen out particularly irrelevant responses.  And

23 | in this case -- in this case because there are so many

24 | third-party products, major ones like Vagicaine, Vagistat --

25 | which until recently, for 30 years, this was a third-party

Combe v. Wolff

28

1   mark Combe acquired it only recently.  Because there are so

2   many marks out there that you control in this case was

3   critical.

4           The controller that was picked was Vagipur.  And

5   that was simply inadequate.  We can see that Vagicaine is not

6   infringing.  So a proper control would have been something

7   like Vagican or Vagistat.  For 30 years it's non-infringing.

8   A proper control would have been something again that picked

9   up that "A" sound in the suffix.  They picked one that was

10  totally far afield "pur," which as our expert testified for

11  many people would signify a geographical location.  It's a

12  common suffix in India and that part of the world to designate

13  a town.  And it's very clear that had they used a proper

14  control in this case, they would have had a much larger number

15  of confused people on the controlled side who would have been

16  deducted.

17          And then we've already talked about marketplace

18  conditions and I'm not going to go into that again.  But when

19  we did -- when we looked at the verbatim results, when we

20  properly subtracted from both the control side and the test

21  side, those people who -- who mentioned Vagisil, not because

22  they were confused, but only because it was the only name they

23  knew or maybe it was one of the number of marks that they

24  passed out.  It was just a memory test.

25          When you properly deducted the people in that

Combe v. Wolff

29

1 category, the confusion level went from 19 percent, which

2 wasn't very high to begin with, down to the 11 to 12 percent

3 level.  And had they done a proper marketplace survey, showed

4 people the brand that's going to be used, it would have been

5 below ten percent without doubt.  If the same thing happened

6 as in the *Victoria Secret* case, it would have been half of

7 that.  So five percent.  That's not enough to show confusion

8 and it is enough to exclude the survey entirely.  As I say,

9 it's clearly up to Your Honor whether to exclude or --

10           THE COURT:  What's the standard that the TTAB uses

11 in determining whether an application should issue as a

12 protected mark?

13           MR. GROW:  They use a --

14           THE COURT:  What's the statute that governs?  What's

15 the standard?

16           MR. GROW:  The statute is the likelihood of

17 confusion provision in the Lanham Act Section 2D, but they use

18 a set of standards much like the Fourth Circuit uses to

19 evaluate whether two marks are confusingly similar.  Surveys

20 are just one of many things.  Probably the most important

21 factor is how strong is the plaintiff's mark.  Vagisil is an

22 extraordinarily weak mark.  There are a lot of third-party

23 marks out there.

24           And it's kind of like if Carfax, a well known used

25 car dealer, came into this Court and wanted to stop somebody

Combe v. Wolff

30

1    from using Carman.  They don't get any exclusive rights in the

2    word "car."  And if people see Carman and think of Carfax that

3    doesn't mean they're confused.  That's what's wrong with this

4    survey.  You go through the same analysis.  You say how strong

5    is the plaintiff's mark.  How much protection does it get.  It

6    doesn't get any protection from the word "Vagi."  You look at

7    how close are the marks; how close are the goods; what are the

8    trade channels; what is this sophistication; how much care do

9    they exercise.  The TTAB found that when somebody buys an

10   intimate product like this, it's not like buying a candy bar

11   at the checkout stand.  They look at it carefully.  They weigh

12   their decision.  And that was just one of many things along

13   with the third party use --

14            THE COURT:  Would you attack the qualifications of

15   Poret?

16            MR. GROW:  No.  Mr. Poret is an expert witness who's

17   testified many times.  He's qualified to do a survey.  Our

18   problem is --

19            THE COURT:  He's not the one who's a lawyer?

20            MR. GROW:  He is the lawyer.  Yes, Your Honor.  He

21   doesn't have a background like our expert in consumer behavior

22   or consumer resource --

23            THE COURT:  Why is he an expert?  I dare say I've

24   heard as many registration and trademark cases in the past 32

25   years that I've been here as he has.

1          MR. GROW:  The only basis for his expertise is that

2     he's done a lot of surveys and some courts have accepted them.

3          He clearly doesn't have the same understanding as

4     our expert, Dr. Simonson, who pointed out a number of flaws in

5     the methodology.  And most important of all is --

6          THE COURT:  I don't understand why I don't make that

7     determination at the trial when I have them both before me,

8     hear them, and make a finding of fact as to which opinion I

9     think, if either one.  It may be that both of them don't

10    impress me.

11         MR. GROW:  Your Honor, it's entirely your

12    prerogative.  We think it should be excluded for all the

13    reasons we've stated, but it's entirely up to you.

14         THE COURT:  All right.  Let me hear your response

15    briefly.

16         MR. REHEW:  Thank you, Your Honor.  First, Mr. Poret

17    does have a mathematics degree and --

18         THE COURT:  Well, I have one in engineering Physics

19    does that make me any better?

20         MR. REHEW:  I think if Your Honor did surveys and --

21         THE COURT:  No, no.  Come on.

22         MR. REHEW:  Mr. Poret he is one of -- as a

23    specialist in this area, Mr. Poret is one of the desired

24    experts.  He's done many, many surveys.  He's been accepted by

25    many courts.

Combe v. Wolff

32

1      THE COURT:  All right.  Well that's certainly

2 persuasive, but do you think people would be experts in

3 statistics and inferences of that sort?  I've seen other

4 surveys where they have expertise.  But in any event, go on.

5      MR. REHEW:  Okay.  And, Your Honor, you put it best.

6 And in fact Wolff made the argument in our -- in opposing our

7 motion to Daubert -- part of their expert.  And they said at

8 the end of their brief that because this is a bench trial,

9 this stuff should come in.  The expert should be allowed on

10 the stand, our expert should be allowed on the stand in our

11 view and he can explain everything.  I can explain some of it

12 now, but he can explain why he was right.

13      THE COURT:  The only thing that troubles me about

14 that is what your co-counsel said.  Remember what she said

15 that got my attention?

16      MR. REHEW:  "Waste of time."

17      THE COURT:  Waste of time.

18      MR. REHEW:  But this Your Honor would not be a waste

19 of your time.  This would not be a waste of your time at all.

20      To address the points of both counsel made.  There

21 was one respondent that was misquoted.  And that is not

22 unusual.  It happens all the time.  This is a classic issue

23 that goes to the weight of the survey.  And the other survey

24 responsive that they say are invalid are ones where people in

25 follow-up questions did mention Vagisil.

─Combe v. Wolff─

1          What's critical here is this was an *Eveready* survey.

2    And Your Honor has seen *Eveready* surveys.  It is a very

3    standard survey.  And counsel mentioned that this survey

4    showed people Vagisan and Vagisil.  That's not true.  An

5    *Eveready* survey only showed the defendant's mark, "Vagisan."

6    And for people to say Vagisil they had to come up with that on

7    their own.  And that's critical.  It's a very conservative

8    method and it's a very powerful method.  And that's why

9    court's have said it's the gold standard in survey research.

10          They attack the fact that Mr. Poret didn't look at

11   the reasons people gave for their confusion.  And I think in

12   that argument is misguided, because it ignores the fact that

13   this is an *Eveready* survey.  People were shown the mark and on

14   their own they said "Vagisil."  And so that in and of itself

15   is enough to show confusion.  And it's wrong to say that

16   people have to then, in response to follow-up questions, say

17   they were confused because of the name.

18          And there's a simple example here.  There is a

19   simple analogy.  If somebody were to ask you:  Why did you buy

20   that watch?  You might say, Oh, I like the band or I like the

21   color, I like the way it looks.  Very few people would state

22   the obvious and say I bought that watch because I need

23   something to tell time.  And that's why in these surveys

24   people don't -- experts don't rely upon the reasons people

25   give for their confusion.  They take their confusion and they

1    subtract noise from a separate control set.

2         And in our briefs we've explained a number of

3    experts THAT have said that's the way you scientifically must

4    run a survey.  You don't look at the reasons why.  They're

5    absolutely wrong that that's the way you do this.  It is not

6    the way it should be done.

7         And we cite in our briefs Jerre Swann.  They cite

8    McCarthy, a McCarthy section that says the reasons people give

9    in the why questions to a survey are instructive.  And while

10   they're instructive, they're not necessary and they're not

11   suppose to wreak havoc.  In that same McCarthy section they

12   cite, there is a part of the cite that they didn't give, which

13   is another -- yet another expert saying, "The scientific

14   literature reveals that placing great weight and relying to

15   answers and why questions runs counter to generally accepted

16   scientific wisdom and research finding."

17        What does that mean?  It means if you have a good

18   control you don't look at the reasons why people give because

19   again they don't always state the obvious.

20        Now, our control here could not have been better.

21        They complained that there is other Vagis out there

22   and Vagi is a common suffix.  Well, the control that Mr. Poret

23   used was Vagipur.  It had Vagi in there.  So if people were

24   confused because of the prefix "Vagi" that would be subtracted

25   out of the control.  He measured for that very exact

Combe v. Wolff

35

1  phenomena.  Vagipur is a phenomenal control.  And in many

2  times in these cases controls can go far afield.  Not this

3  control.  This is really the optimal control.  And when we

4  look at control, they have to -- the rule is -- and both

5  parties' agree -- they have to come as close as possible to

6  the infringing mark without infringement.

7        And the controls that they're suggesting we should

8  use, Vagi plus a "S," that's too close.  That's what our case

9  is about.  Our case is not about just Vagi.  It's about using

10  Vagi plus "S," plus a vowel, plus a constant.  And so the

11  control, when it's close as possible without violating the

12  rule that you have to cross the line.

13        Now, another reason this survey should come in,

14  aside from the fact that all of this goes to these are

15  methodological nitpicks that go to weight and not

16  admissibility, another reason it should come in is they

17  recalculated the numbers.  They took our 18 -- 19 percent and

18  they said the result really is 12 percent in one brief and 12

19  and a half percent in another brief.

20        Well, in the Fourth Circuit, under the Sara Lee

21  case, 12 percent is enough for actual confusion in a survey.

22  And I refer to the Sara Lee case in our briefs, which is a

23  Fourth Circuit case.  So even if you take their criticisms

24  there certainly is relevance to this survey.  And that's --

25  Sara Lee is 81 F.3D --

Combe v. Wolff

36

1          THE COURT:  Oh, I know where to find it.

2          MR. REHEW:  Okay.  So even taking their criticisms

3    as true, Your Honor, the numbers that they come up with --

4    this is enough.  The point of this there is all enough in here

5    for this to be probative, to be relevant, to be not a waste of

6    time at all.

7          THE COURT:  All right.  Just a moment here.  When is

8    the trial set?

9          MR. REHEW:  December 4th, Your Honor.

10          THE COURT:  All right.  As a concession to the

11   shortness of life, let me end the argument.  All of these

12   arguments that you've made, both sides, are helpful to me.

13   I've listened to them.  They're all in your briefs which are

14   not short.

15          In fact, did someone violate the 30-page limit?

16   Maybe it wasn't in this case.  No.  But they're lengthy

17   briefs, they're thorough, and you make all of these points and

18   they're important points for you to make.  But in my view on a

19   bench trial they go to the weight not to the admissibility.

20          Now, there will be extreme circumstances where I

21   might say that's so weak I won't even consider it, but I don't

22   need to make that determination now.

23          If the trial is December 4th, then I need to have

24   proposed findings of fact and conclusions of law submitted at

25   least a month in advance.  So that would be by November 2nd.

1   Close of business November 2nd.

2          Now, in those findings of fact and conclusions of

3   law, I want you to be sure that you cover, in the conclusions

4   of law, what standard you think the Court in this 1071 case

5   should apply to deciding whether to allow the mark to issue or

6   not.  I think counsel is correct to point out that I don't

7   cancel the mark because Vagisan hasn't issued, but I do say

8   whether it's allowed to proceed to issuance or whether it

9   should not.

10          And, yes, the overall test is whether it's so close

11  that there's potential for confusion.  I'm sure that part of

12  the analysis includes, as it did before the TTAB, whether it's

13  a strong or a weak mark, whether it's suggestive or

14  descriptive and so forth.  But I want all of that.  And the

15  orders that I will enter saying that these motions are denied

16  because of the evidence -- it goes to -- will come in.  And it

17  goes to the weight, not to the admissibility, does not

18  preclude the Court at the time of trial saying:  Well, I'm not

19  even going to consider that because it's so far afield.  But I

20  don't want you to think that you've wasted your time on these

21  three motions, because it has helped to bring me up-to-date

22  and educate me.

23          The one issue that I find particularly interesting

24  is whether it's completely illegitimate to submit a survey

25  that does more than simply what the TTAB would typically see,

Combe v. Wolff
38

 1   which is just the two marks with nothing else.

 2            I don't even know why the TTAB would limit itself to

 3   that.  I don't see that in the statute.  If there's other

 4   evidence, there might be other evidence.  But I will look at

 5   these cases that you-all have cited carefully.  And I also

 6   have a sense that when the defendant, when Wolff ultimately

 7   enters this market, as there's a good chance that it will,

 8   does the whole thing have to be reopened?  Of course not, but

 9   we'll have to see about that.  It's an interesting case.  What

10   you've done has helped educate me.

11            But I'm going to deny these motions.  They --

12   nothing will be excluded.  The criticisms and the studies will

13   come in.  I will hear testimony about them and we'll make a

14   more informed judgment about whether it is persuasive or not

15   at the time of the trial.

16            All right.  And I've set the date for the filing of

17   findings of fact and conclusions of law.  And they will be --

18   well, they will be simultaneous and then you can respond.

19   I'll put that in there.  14 days later.

20            What is the burden here?  This case was brought

21   under Section 1071 by Combe.  Typically plaintiffs have the

22   burden.  And that burden would be in preponderance of the

23   evidence.

24            Do you agree with that from the plaintiff?

25            MR. REHEW:  Yes, Your Honor.  I have not researched

Combe v. Wolff

39

1    that in detail.  That makes intuitive sense.

2            THE COURT:  All right.

3            MR. PANKO:  Yes, Your Honor.

4            THE COURT:  All right.  Well that too should be in

5    your findings and conclusions.  I think that's the case.  Once

6    again, thank you for your arguments.  It's been helpful.  It

7    helps me frame and focus my attention for the trial.  I'll

8    look forward to studying your findings of facts and

9    conclusions.  But we need to get this matter resolved.

10           And, of course, the appeal would be to the Fourth

11   Circuit, not to the federal circuit.  Interesting that that

12   was done.  I remember back in the old patent days we used to

13   station people at phone booths.  As soon as something was done

14   at the PTO, we would have to go to different circuits and

15   whoever made -- got the first paper filed -- it was a bad

16   system and I'm glad to see it gone.

17           Thank you.

18           MR. REHEW:  Thank you, Your Honor.

19

20           **(Proceedings adjourned at 11:32 a.m.)**

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for the

4    Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Motions Hearing

7    in the case of the **COMBE INCORPORATED versus DR. AUGUST WOLFF**

8    **GMBH & CO. KG ARZNEIMITTEL**, Civil Action No. 1:17-CV-935, in

9    said court on the 31st day of August, 2018.

10         I further certify that the foregoing 40 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this September 7, 2018.

17

18

19

20

21                             _____
                               Tonia M. Harris, RPR
22                             Official Court Reporter

23

24

25

Tonia M. Harris OCR-USDC/EDVA 703-646-1438
EASTERN DISTRICT OF VIRGINIA