—————Combe v. Wolff—————

421

```
1                 UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                     ALEXANDRIA DIVISION

3   ------------------------------x
                                  :
4   COMBE INCORPORATED,           : Civil Action No.
                                  : 1:17-CV-935
5           versus                :
                                  :
6   DR. AUGUST WOLFF GMBH         :
    & CO. KG ARZNEIMITTEL,        :
7                                 : December 7, 2018
                    Defendant. : Volume III of III
8   ------------------------------x

9                TRANSCRIPT OF BENCH TRIAL
            BEFORE THE HONORABLE T.S. ELLIS, III
10               UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  FOR THE PLAINTIFF:        ANNA BALISHINA NAYDONOV, ESQ.
                              DOUG RETTEW, ESQ.
13                            Finnegan Henderson FArabow Garett
                              & Dunner LLP (DC)
14                            901 New York Ave NW
                              Washington, DC 20001-4413
15
    FOR THE DEFENDANT:        MICHAEL GROW, ESQ.
16                            ROSS PANKO, ESQ.
                              Arent Fox PLLC
17                            1050 Connecticut Ave NW
                              Washington, DC 20036-5339
18

19  OFFICIAL COURT REPORTER:  TONIA M. HARRIS, RPR
                              U.S. District Court, Ninth Floor
20                            401 Courthouse Square
                              Alexandria, VA 22314
21

22

23

24

25
```

Combe v. Wolff

422

TABLE OF CONTENTS

MISCELLANY

Preliminary matters...................................... 423
Closing argument by Mr. Rettew.......................... 426
Closing argument by Mr. Parot........................... 445
Certificate of Court Reporter........................... 461

EASTERN DISTRICT OF VIRGINIA

1                    **P R O C E E D I N G S**

2    (Court proceedings commenced at 2:39 p.m.)

3            THE DEPUTY CLERK: Combe Incorporated versus Dr.

4    August Wolff GmbH & Co KG Arzneimittel.  Civil Case No.

5    1:17-CV-935.

6            THE COURT:  All right.  The record will reflect that

7    the parties and counsel are present and prepared to proceed,

8    or at least parties' counsel are present and prepared to

9    proceed.

10           This is a bench trial, the evidence of which has

11   been taken, and we are now at the point of closing argument.

12           And be seated, please.  And I've told you that I'll

13   give you each 30 minutes.  You may choose what you want to say

14   during the 30 minutes.  Obviously, a good bit of the testimony

15   is focussed on the fame and confusion surveys by the

16   plaintiff's proposed -- or plaintiff's expert and the

17   defendant's criticism, both by defendant's expert, and also by

18   defense counsel who made criticisms of the surveys different

19   from and in addition to those offered by the -- their expert.

20           So you may choose what you want to say, but there

21   are two minor matters I want to clarify first:

22           I told the -- or I excluded from the evidence a

23   demonstrative that the defendants offered that I think was a

24   map or some kind of -- maybe it had the p-u-r or p-o-r's on

25   it.  I need to have the exhibit number for that.

Combe v. Wolff

424

1          MR. PANKO:  It's 185, Your Honor.

2          THE COURT:  185.  Thank you.  Now, I also told the

3   defendant that the defendant could submit an affidavit by the

4   defense expert, which countered or would seek to counter a

5   demonstrative or an exhibit that the plaintiff introduced

6   through its expert in which, essentially, what the plaintiff's

7   expert said is, well, look even if I do what you say, even if

8   I accept what you say, there's still a number high enough to

9   show confusion.

10          Am I correct about that?

11          MS. NAYDONOV:  Yes, Your Honor.

12          THE COURT:  All right.  What exhibit number was

13  that?

14          MS. NAYDONOV:  We filed it this morning.  I think it

15  was -- one moment, Your Honor.

16          THE COURT:  All right.

17          MS. NAYDONOV:  Those were 1666, 1667, and 1668.

18          THE COURT:  Now, you agree with that?

19          MR. PANKO:  Yes, Your Honor.

20          THE COURT:  All right.  Now, I told the defendant

21  that the defendant could file an affidavit rebutting that.  I

22  think I limited it to two pages.  Let me change that.  I'll

23  limit it to three pages, because looking at that, there's

24  enough information on there that that might be necessary.

25          If you want to exceed three pages, you can do that,

Combe v. Wolff

425

1  but file a motion and tell me why it was necessary.  But don't

2  do that unless you really, really have to.  And that, of

3  course, will be an affidavit by your experts saying why

4  Poret -- is that his name?

5           MR. RETTEW:  Yes.

6           THE COURT:  Poret, Mr. Poret was wrong -- or is

7  wrong in his response.  Now, I think that's all that I left

8  open.  Am I correct or was there something else?

9           MS. NAYDONOV:  Yes, Your Honor.  You also allowed us

10 to file a counter affidavit two days after their deadline.

11          THE COURT:  Oh, all right.

12          MS. NAYDONOV:  Remember --

13          THE COURT:  Yes, I did.  All right.  I think that

14 takes care of all evidentiary matters that haven't been

15 resolved.  I mean, there's a major issue that I have to

16 resolve in the course of deciding this case, and that is the

17 relevance of evidence from other countries, specifically

18 Europe, where it is the defendant's position that the

19 plaintiff, Combe, has had its mark, Vagisil, coexist without

20 objection or confusion in England or UK and Poland and maybe

21 that's all, I don't know.

22          And you -- the plaintiff says that's irrelevant

23 under settled law and the defendant claims otherwise.  I

24 admitted all of the evidence relating to that, and in my

25 decision, I will address the evidence, address its

1 significance and its admissibility.

2         Now, that takes care of everything, does it not?

3         MR. PANKO:  Yes, Your Honor.

4         MS. NAYDONOV:  Yes, Your Honor.

5         THE COURT:  Does it eliminate the need for your

6 closing arguments?

7         MR. RETTEW:  No, Your Honor.

8         MR. PANKO:  No, Your Honor.

9         THE COURT:  Well, it was worth a try.

10         All right.  Let's begin with the plaintiff.

11                     **CLOSING STATEMENT**

12         MR. RETTEW:  All right.  Thank you, Your Honor, and

13 thank you for the Court's time in this matter.

14         As I mentioned in our opening, this case is about

15 one thing and one thing only, and that is Wolff's block letter

16 trademark application for the made-up word "Vagisan."  It's

17 not about the prefix "Vagi."  It's not be the word "vagina"

18 for women's intimate body parts.  It's about this trademark

19 application.  And because this is a 1071 case, this Court's

20 precedence in supreme -- in *Seacret Spa* applies.

21         And this Court said in the registration context,

22 it's not the actual uses of a mark in the marketplace, but

23 uses listed in the application that are critical.  Court went

24 on to say, "For purposes of registration, it's the mark as

25 shown in the application and used on the goods described in

Combe v. Wolff

427

1    the application which must be considered, not the mark as

2    actually used."

3         Now, Wolff says that this Court and Judge Cacheris

4    got it wrong.  He did not.  He relied upon the Supreme Court

5    precedent in *B & B Hardware*, and he understood and actually

6    cited the *Swatch* decision.  And this court understood that

7    there's a difference between an infringement claim and a pure

8    registrability determination.  And it is a very significant

9    difference that boils down to this:

10        If a registrant gets a standard character mark

11   without a claim to any font, style, size or color, as we have

12   here, the registrant is entitled to depictions of the standard

13   character mark regardless of the font, size, style or color.

14        And so what does that mean here?  What it means is

15   all that's at issue is what's shown on the left of the screen,

16   the Vagisan trademark application.  Now, if they register

17   this, they get rights in every possible permutation and form

18   of that mark.

19        Now, that could include the packaging shown on the

20   right, which is their foreign packaging, but it also could

21   include something like this, which looks awfully similar to

22   the real Vagisil.  It could include something like this, which

23   looks very similar to that.  They could get a version that

24   looks like this, which looks very similar to the real Vagisil.

25        So what they're trying to apply for, what they're

Combe v. Wolff

428

1   trying to get is much broader than their actual foreign uses,

2   which as we've shown or now have argued, is irrelevant.  So

3   when we look at this, under this proper lens, we apply it to

4   the likelihood of confusion factors in the Fourth Circuit.

5   And when we apply these facts and likelihood of confusion

6   factors, confusion is not only likely, it is truly inevitable.

7        And so I'd like to go through the different factors

8   that the Court is going to look at.  First, we have the

9   distinctiveness of the senior mark.  Now, Combe has a number

10  of trademark registrations for its Vagisil trademark, and that

11  gives us the presumption of validity.  It also gives us

12  another very important presumption, and that is the patent and

13  trademark office never required a disclaimer or secondary

14  meaning for the Vagisil mark.

15       So, therefore, under Fourth Circuit precedence,

16  under the *Pizzeria Uno* case, it is presumed to be suggestive

17  and protectable and entitled to a strong scope of protection.

18  It is also a made-up word.  You heard Ms. Thevessen, you heard

19  our witness talk about the fact that Vagisil is a made-up

20  word.  It doesn't mean anything.  And Ms. Thevessen from Wolff

21  testified that there's no competitive need to use a trademark

22  that has Vagi at the beginning.

23       She noted and acknowledged that there are

24  competitive products in the United States that don't use Vagi

25  up front.  And, in fact, when they were considering what to

Combe v. Wolff

429

1   name their product, they looked at ten other names that did

2   not have Vagi in it.  They had Gynoflor, they Saniflor, they

3   had Sanolakt, and so therefore, it is an inherently

4   distinctive mark.  It is also strong in the marketplace, and

5   we've submitted substantial evidence of marketplace strength.

6        Now, Wolff says that marketplace strength is

7   subservient to inherent distinctiveness, to inherent strength,

8   and we disagree.  There's precedent, it's Your Honor's case,

9   the *Renaissance Greeting Card* case where you said of the two

10  considerations, commercial strength is more important, and you

11  gave several examples:  American Airlines, PayLess drugstores,

12  Kentucky Fried Chicken.

13       Those are marks which were inherently weak, but

14  became very strong through marketplace use, and so therefore,

15  conceptual strength controls, and here we have massive

16  evidence of conceptual strength.  Vagisil started in 1973.

17  The Vietnam war was winding down, American Graffiti and

18  Exorcist had just hit the movie theatres, and over the next

19  45 years, the sales have been massive.  Since 1991, there's

20  been over $1 billion of sales of Vagisil.

21       The marketplace share that Vagisil has in numerous

22  product categories trumps many others.  And this evidence that

23  we've submitted in this case was not before the Trademark

24  Trial and Appeal Board.  Now, the board criticized Combe for

25  not putting its evidence of sales and recognition into a

Combe v. Wolff

430

1    marketplace context.  We've done that here and it's fairly

2    substantial.

3           There's also the advertising.  Combe has spent

4    $350 million in advertising just from 1993, plus 75 million

5    since 2008 on virtually every form of advertising you could

6    have.  There is television commercials in national broadcast

7    stations.  We have print publications and significant ones.

8    TV Guide, People, Cosmopolitan, Better Homes and Gardens.

9           There's radio ads that have flooded the marketplace

10   for Vagisil.  There are other forms of advertising, online,

11   social media, coupons, displays.  And as a result of all of

12   Combe's efforts and success, Vagisil has done what other

13   brands hope and dream to do.  It's become a part of our

14   cultural icon, of our cultural discussion.

15          It gets attention in advertising age, New York

16   Times, Washington Post.  It even has -- it's even mentioned in

17   very popular national TV shows, Big Bang Theory, South Park.

18   There was a Saturday Night Live skit which was devoted just to

19   Vagisil, and we heard from Combe's witness that in the course

20   of that skit, it was mentioned numerous times, over and over.

21          So with all of this, we don't need to do more to

22   prove fame, but we did --

23          THE COURT:  I'm not sure I'd be proud of the fact

24   that I was mentioned or that anything I cared about was

25   mentioned on Saturday Night Live.  Proceed.

Combe v. Wolff

431

1          MR. PANKO:   Sometimes mockery is the best flattery.

2          But for a brand, Your Honor, that's recognition and

3  that shows that it's something that is engrained in our --

4  engrained in popular culture.

5          But with all of that, with all of that recognition,

6  with all of that strong evidence, we did one step further and

7  we went and did a survey.  And you heard from Mr. Hal Poret

8  who Your Honor had credited in the *Valador v. HTC* case.  And

9  he tested fame in two ways:  First, unaided brand awareness

10 and he got a whopping 38.8 percent, and this is very, very

11 significant because people thought of this on their own.  They

12 brought this up without -- they mentioned Vagisil without

13 being prompted in any way.

14         And Your Honor asked me during trial, how do we

15 measure fame?  How can we -- you know, what's the yardstick

16 for fame.  And my answer was:  Well, we look to the case law

17 and what other courts have said based upon similar evidence.

18 And I think one great case is Your Honor's decision in

19 *Ringling Brothers*.  And in *Ringling Brothers*, there was

20 41 percent recognition for The Greatest Show on Earth.

21         Now, there, the expert, Michael Rapaport, had given

22 people a cue card and it said, The Greatest, blank, on Earth,

23 and they were to fill in whatever they thought it was.

24 41 percent said, "Greatest Show on Earth."  Now, that is --

25 and rightfully, that was a measure of fame.  But that was a

Combe v. Wolff

1  measure of fame where they were prompted.  They were given

2  some words and they filled in the blank.

3       Here, we have almost that same level of fame without

4  any prompting.  People thought of Vagisil when simply asked:

5  "Name as many vaginal care products as you can."  So that's a

6  substantial number, and even Dr. Simonson had to admit that

7  this is an impressive number.

8       If that weren't enough, we went ahead and did an

9  aided awareness survey, and there the number shot up to

10  90 percent.  And this is significant because this is not just

11  women, this is men and women.  This is people who use the

12  product and people who don't use the product.  So these

13  numbers are impressive on their own right.  But the fact that

14  it's the general consuming public is even more impressive.

15       Now, for its part, Wolff did not run a survey.  They

16  could have conducted a survey.  They tried this case through

17  the end, but they did not run any surveys.  So what are they

18  left to do?  They are left to criticize the survey.  First,

19  they criticize this by saying Vagizox is an unrealistic

20  control, and there's a couple of problems with that.  Wolff's

21  very own witness admitted that Vagizox could be a plausible

22  brand name.

23       Now, Wolff said, okay, well, she's not a survey

24  expert.  But she's even better than a survey expert because

25  she's somebody who manages these products on a global basis.

Combe v. Wolff

433

1    She knows the market, she knows competitors, and for her to

2    say that Vagizox is a plausible brand name shows that this is

3    absolutely a perfect control.

4          Now, another way we know that this was a good

5    control is by the numbers.  The numbers don't lie here.

6    Vagizox got 5.3 percent.  And Mr. Poret testified that when

7    you have a made-up unknown brand name, that that's pretty

8    consistent with what you get to measure demand effects in this

9    sort of survey.

10         Now, we know the demand effects didn't control the

11   survey as Dr. Simonson says because there's a nice spread

12   here.  We've got 90 percent from Vagisil, but we also have

13   Vagi-Gard with 18 percent and we've got SweetSpot with

14   5 percent and Luvena with 12 percent.  If there were truly

15   demand effects here, everything would be clumped up and the

16   numbers would be very high.  But this spread shows two things.

17   It shows that there were no demand effects that were not

18   controlled for and that this rightfully mirrors the

19   marketplace realities.

20         More than that, Your Honor, Wolff's own expert, four

21   times in his testimony, agreed that Vagisil is a well-known

22   mark.  He said, I think it is well-known, however you define

23   it.  He said, I think it is well-known relative to the other

24   brands in this category.  Vagisil, he said, is well-known in

25   this category again.  When talking about another mark, he

Combe v. Wolff

434

 1    said, it's not as well-known for this specific category as

 2    Vagisil.

 3            So Wolff, therefore, with no survey, tries to build

 4    its case on third parties.  And you will see from the

 5    declaration that was submitted, which we stipulated to, Wolff

 6    had a paralegal go out to try to find as many third-party uses

 7    as he could for the -- for a period of two months.  He spent

 8    two months looking for third-party uses, and this is the best

 9    he could do.

10            Now, this is not our demonstrative, Your Honor.

11    This is Wolff's demonstrative.  But when you think of the

12    vast universe, that is the internet, with over 5 billion

13    web pages, the fact that this is the best they could do shows

14    one thing:  That the marketplace is not flooded with Vagi

15    marks as they say, and we know this also from the testimony.

16            You heard from Wolff's witness, Ms. Feldman, that

17    she did not know virtually all of these marks, and even

18    Wolff's witness testified that before this case, before 2016,

19    she had never heard of these marks.  And that's pretty

20    significant, because they had been looking at the U.S. market

21    since 2011, and they said that U.S. is a very serious

22    important market that one must prepare for very well.

23            And despite preparing very well for years, they

24    didn't know about any of these marks until their lawyer, at

25    the Trademark Trial and Appeal board level, went out and did

Combe v. Wolff

435

1  Google searches for it.  Now, there's a reason she didn't hear

2  about these names.  They're very insignificant.

3          So let's go through some of them.  You've got

4  Vagistat, which is irrelevant because it's now owned by Combe,

5  and was for a different type of product.  Then we've got

6  Vagicaine, which is the store brands, and those are the ones

7  that are sold under CVS and Rite Aid and these -- and the

8  other well-known retail brands.

9          Now, what's interested is Dr. Simonson testified

10  that the day before his deposition, he went into a store.

11  Now, this is Dr. Simonson, a marketing professor hired by

12  Combe, goes to a store the day before his deposition to look

13  at the shelves to see what he could find.  And you heard him

14  say that all he could remember on that shelf was Vagisil,

15  Monistat, and a private label brand he can't remember.

16          And it proves the point that people think of these

17  private label brands by CVS, Rite Aid or whatever the -- or

18  Equate in the case of Walmart.  Now, we know this also from

19  our survey.  If you look, Your Honor, you can see the -- on

20  the unaided awareness survey, Equate was number 10 out of 25.

21          Now, what is Equate?  Equate is the Walmart private

22  label brand.  Not one person said Vagicaine, not one, because

23  they don't think of that as a stand-alone brand.  So that is

24  also irrelevant.  Also, the sales of that, even though more

25  than the other third parties, pales in comparison to Vagisil.

Combe v. Wolff

436

```
 1            So let's look at the others that Wolff was able to
 2    find.  You've got Vagi-Clear and Vagi-Soothe.  Those are two
 3    products over -- the evidence that you've received by
 4    stipulation shows $12,000 in sales for these products over
 5    several years.  $12,000 versus 1 billion for Vagisil.
 6    Vagical, $813 over four years.  VagiCare is a Canadian
 7    probiotic product that we only know of one sale, and that's by
 8    Wolff's paralegal.  Vagi-Cure, four years, only $35,000 in
 9    sale.  VagiKool is an ice pack.  It's an ice pack for womens'
10    intimate area, and we heard Dr. Wolff's, Ms. Thevessen, admit
11    that that's a noncompetitive product.
12            Now, she didn't want to admit that on the stand, but
13    it was only when faced with her prior testimony that she had
14    to admit that this, in fact, is not a competitive product.
15            Then we have Vagi-Sitz, which is a bath.  It's
16    actually a bathing product and we only know of one sale there,
17    it's Wolff's paralegal.  Vagi-Sal -- I'm sorry, Vagi-Pal, we
18    only know of Wolff's one purchase.  Vagifresh has had $2,148
19    in sales since 2015.  It's irrelevant.  Vagitone, in 2018, had
20    $346 in sales.  Vagifirm is actually a tightening pill.
21    Again, Ms. Thevessen admitted that that's a noncompetitive
22    product, and we only know of one purchase, and that is from
23    Wolff's paralegal.
24            Now, in addition to being insignificant, none of
25    these marks have the elements that are at issue in this case.
```

Combe v. Wolff

437

1   None come as close to Vagisil as Vagisan.  None have Vagi,

2   plus "S," plus a vowel, plus a consonant.  And if we were to

3   put these in proper perspective, it would look like this, Your

4   Honor:  You'd have Vagisil sales of over a billion dollars and

5   we've got everybody else.  And that is truly significant and

6   it shows why these third-party marks have no marketplace

7   recognition and really should be disregarded.

8          So in the end, though, we don't have to -- we don't

9   have to guess because we studied this.  We surveyed this, we

10  tested this empirically.  In Mr. Poret's confusion survey, not

11  one person mentioned these names, not one.  And they were

12  shown two different marks and asked if they confused that with

13  anybody else, didn't mention one.

14         In the fame survey, less than 2 percent of the

15  recognition were these Vagi marks.  One of them is Vagistat.

16  So we've proven empirically that these are irrelevant, and

17  they do not excuse Wolff's infringement here, nor do they

18  denigrate the tremendous strength of the Vagisil trademark.

19         Now, Judge, you said in the trial at one point that

20  it makes no sense to require a company to spend money on

21  trademark lawyers to go after every third party, and it pains

22  me to admit that that is the reality that is.  Companies

23  should not have to spend money on trademark lawyers to go

24  after insignificant minor uses like this.  Vagisil is there

25  for a very strong mark.

Combe v. Wolff

1          Then we go to the next factor, similarity of the

2     marks, and there's a couple key concepts here:  First, where

3     goods are identical, like we have here, less similarity is

4     required.  Second, the greater the strength of a mark, less

5     similarity is required.  Third, and this is from *Seacret Spa*,

6     this Court explained similarity should not be evaluated side

7     by side, but by considering the marks in light of consumers'

8     fallible memories.  And fourth, the marks must be considered

9     in their entireties and not dissect it.

10          And so when we look at it that way, Vagisil and

11     Vagisan come very close, almost as close as you can get.  It's

12     two letters off.  And if a strong mark like Vagisil, if that

13     fame of that strong mark does not extend to something like

14     Vagisan, it's going to be given virtually no scope of

15     protection, and that's not what the trademark law says should

16     happen.  The trademark law says strong marks should be

17     entitled to strong protection.

18          Now, Wolff knows, has admitted that these marks are

19     similar, and we know this from the UK opposition.  And if

20     Your Honor lets the foreign uses in, the UK opposition was one

21     where Wolff said that Vagisil and Vagisan are too similar.

22          THE COURT:  Who said that?

23          MR. RETTEW:  Wolff did when they opposed the Vagisil

24     trademark in the UK.  If that evidence comes in, you saw

25     the -- and you saw the opposition, Your Honor, we showed the

439

1    language.  They said the marks are similar.  Now, Wolff -- I

2    mean, Combe has never backtracked from that.  Combe agrees.

3    In every jurisdiction, Combe has said that Vagisil and Vagisan

4    are similar.  They have not taken inconsistent positions like

5    Wolff.

6              And they are similar.

7              The next factor, Your Honor, is the goods.  The

8    party's goods overlap and we've got the goods, again, are

9    defined by the trademark application.  And you can see what

10   they have in the application is covered by Combe's actual use.

11   Also, the factors of the party's facilities and advertising

12   are presumed identical, and that is, again, from the *Seacret*

13   *Spa* case where Judge Cacheris explained that if you have no

14   limitations in a trademark application, it is to cover all

15   different types of uses.

16             Purchaser care is something else that came up in

17   this trial.  It's not one of the factors that the Fourth

18   Circuit considers independently, but it is something that Your

19   Honor can consider in weighing the factors and the equities of

20   this case.  And the parties agree on something, that intimate

21   health is an embarrassing topic, and I've put Ms. Thevessen's

22   testimony on this.  And she also agreed and admitted that

23   women want to purchase these products, products like Vagisan,

24   quickly, without being seen.

25             And so why is that relevant?  It's relevant because

Combe v. Wolff

440

1  people are not going to sit there at the shelves and spend a

2  lot of time deliberating.  They're going to grab the product

3  and they're going to go, and that means they're going to be

4  more apt to be confused, especially products like these that

5  are not high priced products.

6          And so while it does treat a medical issue, it is

7  still something that people will grab quickly and are very

8  easily to be confused, especially since these products are

9  promoted by word of mouth, which Ms. Thevessen from Wolff

10  admitted.

11          Next issue is intent.  And we talked about that a

12  little bit at trial.  This is a factor that this Court has

13  explained in the registrability context should not be afforded

14  significant weight.  So we're not arguing that there was bad

15  faith here, but it really, really doesn't matter, nor does it

16  require that we have actual confusion.  Not required, but we

17  went ahead and we did a survey, and we used the very

18  conservative Eveready methodology.

19          So people were shown Vagisan and the only way they

20  were confused is if they thought of Vagisil on their own.

21  They had to come up with that on their own.  And so it's very

22  significant that they got 37 percent of people were confused.

23  Then we ran a control using Vagipur, and that was used

24  carefully to determine how many people confused the marks

25  irrespective of the shared use of Vagi.  And it got a result

1  of 18 percent, that is 19 percent confusion, which is more

2  than the amounts that are required in the Fourth Circuit.  The

3  *Sara Lee* case said it was sufficient to have 10 to 12 percent.

4          So Wolff, without its own survey, is left to attack

5  Combe's survey and those attacks fall flat.  The first thing,

6  they say we should have used an actual product and that

7  ignores the issue at hand.  As I talked about earlier, under

8  *Seacret Spa*, that would be improper.  And in *Seacret Spa*, the

9  Court said -- the Court actually criticized an expert for, I

10 quote, "his reliance on marketplace usage."

11         Now, it wasn't a survey in that case.  It was an

12 expert report talking about what's happening in the

13 marketplace.  So it was not a survey.  But what is important

14 is:  The Court said an expert shouldn't rely upon actual

15 marketplace use in a 1071 proceeding like this.  And that's

16 why it would be entirely inappropriate to have used packaging.

17         Now, it also would be inappropriate to have used

18 packaging in a survey because you've got designs there, you've

19 got Dr. Wolff.  So what you would be testing is matters

20 extraneous to the trademark application, and that's why it

21 would be irrelevant, and that's why this design that we did

22 was perfectly the right one to do.

23         Now, Wolff, like it does with the foreign trademark

24 issue, engages in some double speak here.  Before Your Honor,

25 at this very podium, at the motion to dismiss stage, Wolff

Combe v. Wolff
442

1  told you it is impossible to do a survey in this case because

2  they don't have products here.  They said that in the motion

3  to dismiss.

4          Now they say, well, you -- yes, you could have done

5  a survey and you should have used foreign packaging that is

6  not sold by Wolff in the United States.

7          Well, if that were the case, they should have done a

8  survey.  They should have, but they didn't.  And they had an

9  expert who has done many, many, many surveys, but he didn't do

10 one.

11         So he criticizes the survey.  He says Vagipur is too

12 foreign sounding.  There's no valid evidence of this.  Not a

13 single person in that survey said that.  There were 200 people

14 in the control group who were given 600 opportunities through

15 open-ended questions to say that Vagipur is a foreign mark.

16 Not one did.  And Dr. Simonson's suggestion that Vagistan

17 would be appropriate is absurd, with all due respect, because

18 Pakistan is a pretty well-known place.  So that just destroys

19 his theory right there and then.

20         Also, this is not a valid criticism because the

21 Patent and Trademark Office, when they were looking at the

22 Vagisan mark, they thought it was a foreign mark.  They

23 thought it was a foreign word.  They said to Wolff, you need

24 to tell us the significance of this mark, and you also have to

25 tell us if it's a foreign word that can be translated.

Comme v. Wolff

1    So the Patent and Trademark Office thought this was
2  a foreign word.  Under that, on that basis alone, the fact
3  that Vagipur could be considered a foreign sounding mark,
4  which I don't think it is, is certainly enough to show that
5  this was a proper control.
6    Now, Wolff also says that Vagipur is not close
7  enough to Vagisan.  Well, any closer, it would be infringing.
8  And if you have an infringing control, that's not testing
9  noise.  That's not pulling out noise.  It's just adding to the
10 confusion, as Mr. Poret explained.
11   Now, the irony here, Your Honor, is Mr. Poret could
12 have gotten away with using a very different control.  He
13 could have used one of the marks that Wolff was considering
14 when it was picking Vagisan.  It could have used FloriSan, it
15 could have used Sanolakt or any of these other Vagi marks.
16 But he didn't.  He used a Vagi formative mark to pull out
17 confusion and to test whether or not Vagi was causing the
18 confusion here.
19   If he used one of these other controls, his numbers
20 would have been perhaps double than what he had -- or not
21 double, but it would have been significantly higher.  But we
22 do know that Vagipur was a good control because it got 18
23 percent noise.  And as Mr. Poret explained, when you get 18
24 percent noise in a survey, it's doing something.  That control
25 is doing its job.

444

1          Now, to leave no stone unturned, once again, what we

2   did was we recalculated the numbers based upon the way that

3   Wolff says they should be recalculated.  And when we

4   recalculated them by looking at the answers people gave, Mr.

5   Poret got numbers of 23.5 percent and 21.5 percent.

6          So no matter how you slice it, with his control or

7   with this alternate counting method, he got very similar

8   results.  It shows that this is a scientifically valid study

9   that did ferret out -- that got rid of noise and measured

10  confusion accurately.

11         So to sum up, Your Honor, these are the factors.

12  These are the likelihood of confusion factors that have to be

13  considered.  And when we look at it, we've got

14  distinctiveness.  Well, Vagisil is inherently distinctive, and

15  in the marketplace, which as Your Honor noted is most

16  important, it's incredibly strong.  One of the strongest marks

17  in its category with 90 percent brand recognition.

18         The marks are similar.  They have the same number of

19  letters.  They start with Vagi, plus "S," plus a vowel, plus a

20  consonant.  They look alike and they sound alike, Vagisil and

21  Vagisan.  Very easy to confuse these, especially when we look

22  at the fact that this is a trademark application that covers

23  every permutation and variation of that mark, which as we

24  showed in the earlier slides, comes way too close to Vagisil.

25         Similarity to goods or services, they're identical.

1  The facilities employed by the parties, also identical,

2  because there's no limitation in their trademark application,

3  and that's from *Seacret Spa*.  Similarity of the advertising,

4  presumed identical under *Seacret Spa*.  Their intent, well, we

5  don't have anything on intent, but the Court has said -- this

6  Court has said it is rarely relevant.

7          Actual confusion, well, there's no evidence from

8  consumers because they haven't come into the market yet.  And

9  as Ms. Thevessen admitted, there can't be any confusion when

10  they're not here.  But we do have a robust survey that does

11  show significant confusion measured several different ways.

12          So based on all of this evidence, Your Honor, the

13  TTAB's decision simply cannot stand.  Thank you.

14          THE COURT:  Mr. Panko.

15                **CLOSING STATEMENT**

16          MR. PANKO:  Your Honor, the evidence establishes

17  that the TTAB's decision was correct, and that there is no

18  likelihood of confusion between the trademarks Vagisan and

19  Vagisil.  Now, the reason that there is no likelihood of

20  confusion, Your Honor, is because when the evidence as applied

21  to the Fourth Circuit's likelihood of confusion factors, it

22  weighs overwhelmingly in Dr. Wolff's favor.

23          At least five of the confusion factors weigh heavily

24  in Wolff's favor:  The conceptual weakness of the trademark

25  Vagisan -- of the trademark Vagisil, the dissimilarity of the

Combe v. Wolff

446

1   parties' marks, the high degree of consumer care used to buy

2   these products, Wolff's good faith and the lack of actual

3   confusion, including the lack of any valid survey evidence.

4           First, Your Honor, with regard to conceptual

5   weakness, the evidence shows that when Combe adopted the

6   trademark Vagisil back in 1973, the prefix Vagi was already

7   registered by a multitude of companies in connection with

8   vaginal care products.  Registered marks at that time already

9   included Vagisec, Vagilac and many others.

10          So the Vagi prefix was already weak and dilute for

11  products of this nature at the time that Combe adopted it.

12  Combe then ensued to compound that problem in the years that

13  followed by acquiescing in the widespread third-party use and

14  registration of marks that contained the Vagi prefix in

15  connection with vaginal care products.

16          Now, Combe argues today that its acquiescence in

17  those third-party marks shouldn't matter, but that argument is

18  wrong as a matter of law.  As a matter of law, what you have

19  when you have a multitude of marks with a similar element like

20  this is what's known as a crowded field.  And what that means

21  is that consumerists have become conditioned between --

22  conditioned to distinguishing between these marks by looking

23  not at the descriptive prefix, but at the suffix.  They know

24  to look at the suffix of the mark in order to distinguish

25  them.

Combe v. Wolff

447

1          Now, Your Honor, on your screen will be displayed an

2    image illustrating the crowded field of Vagi prefix marks.

3          THE COURT:  Where have I seen this before?  Go

4    ahead.

5          MR. PANKO:  And as you can see, Your Honor, the

6    crowded field includes marks like Vagi-Soothe, Vagi-Clear,

7    Vagifirm, Vagitone and many others.  And for over 30 years,

8    the crowded field also included the mark "Vagistat," a highly

9    successful product that was sold by Novartis and Pfizer in the

10   same stores as Vagisil, including Rite Aid.

11         Now, in addition, prominent among these third-party

12   marks, is the mark Vagicaine, which has, likewise, been sold

13   by major retailers, Rite Aid, CVS, Target, and Walmart for

14   many years.  And not only have the Vagicaine products been

15   sold, but they've sold -- been sold right next to Vagisil on

16   store shelves.

17         So, again, Your Honor, the effect of these

18   third-party uses is to show that consumers understand that

19   when they're looking for vaginal care products, they need to

20   look at the suffix of the marks, rather than the prefix to

21   distinguish them.  And because of that, Your Honor, because of

22   this crowded field, there's no reason why Vagisan can't

23   coexist with Vagisil just like Vagi-Soothe, Vagistat,

24   Vagi-Sitz, Vagicaine and all these others have coexisted with

25   it.

Combe v. Wolff

448

1          Now, Your Honor, over the years, courts have

2   repeatedly considered descriptive prefix cases just like this

3   one, and courts have repeatedly ruled exactly how we're asking

4   the Court to rule, and the way the TTAB ruled.  And one

5   example of that, Your Honor, was the *Water Pik versus*

6   *Med-Systems* case from the Tenth Circuit.

7          And that case involved, just like this one, a

8   descriptive prefix.  There, the descriptive prefix was "sinu"

9   for sinus-related products, and the marks there were

10  SinuCleanse and SinuSense.  And the Court ruled that there was

11  no likelihood of confusion because --

12          THE COURT:  Say that again, please, sir.

13          MR. PANKO:  It was SinuSense and SinuCleanse.  So

14  both had the descriptive prefix "sinu" to denote sinus-related

15  products.  The Court said there was no likelihood of

16  confusion, because the prefix "sinu" was weak and descriptive

17  for sinus-related products as demonstrated by the existence of

18  third-party uses and registrations of various marks containing

19  the sinu prefix.

20          A similar case was the *Wooster Brush v. Prager Brush*

21  case from the TTAB.  The marks there were Poly-Flo and

22  PolyPro.  The descriptive prefix there was "poly," which

23  denoted paint brushes made of polyester.  Again, the TTAB

24  there said the descriptive prefix "poly" was weak and

25  descriptive for products of that type as shown by third-party

449

1    uses and registration.

2            Many other cases have reached the same conclusion.

3    Alltel, it's an Alabama district court case, said that the

4    suffix "tel" was in widespread use for telecommunications

5    services, and therefore, Alltel and Aktel could coexist.

6            The same reasoning of all those cases applies with

7    equal force here, Your Honor.  These third-party marks in

8    evidence show that the mark Vagisil is conceptually extremely

9    weak and that other Vagi prefix marks can and do coexist with

10   it.

11           Combe now argues that the commercial strength of its

12   Vagisil mark overcomes all of these third-party uses and

13   registrations.  But, Your Honor, that argument is wrong.  And

14   the argument is wrong because there are two aspects of the

15   inquiry that looks -- that examines the strength of a

16   plaintiff's mark.

17           One inquiry is the commercial strength of the mark.

18   The other inquiry is the conceptual strength of the mark.  And

19   when you have a mark like Vagisil that's conceptually weak and

20   has become as diluted by third-party uses as that one has,

21   commercial success alone can't overcome that.  And a good case

22   illustrating this point, Your Honor, is the *CareFirst* case

23   from the Fourth Circuit.

24           In that case, the plaintiff's mark was "CareFirst,"

25   which was part of the Blue Cross Blue Shield brand.  And

Combe v. Wolff

450

1   there, just like here, the plaintiff introduced evidence of

2   millions of dollars in sales in advertising figures in an

3   effort to demonstrate the commercial success of its mark.  The

4   Court said that's not enough to show strength or fame of the

5   mark in light of widespread third-party use and registration

6   of the words "care" and "first" in the healthcare field.

7           And the CareFirst court also emphasized, in reaching

8   its decision, that, quote, "A strong mark is one that is

9   rarely used by others."  Again, that same reasoning applies

10  here.  The mark Vagisil can't be considered strong or famous

11  given the widespread use of the prefix Vagi by others.

12          Now, Combe tries to discredit the widespread

13  third-party use and registration evidence, but all of its

14  arguments should be rejected.

15          First, Your Honor, the private label Vagicaine

16  products are just as relevant as all of the other Vagi prefix

17  marks.  Just like all those marks, the presence of these

18  products, particularly in nationwide chains, shows the

19  descriptive nature of the Vagi prefix and shows that consumers

20  have been exposed to Vagi prefix marks over the years.

21          Second, the fact that some of the third-party Vagi

22  prefix marks haven't achieved high sales is irrelevant.  And

23  this is what the federal circuit said in the *Juice Generation*

24  case where the TTAB in that proceeding originally ruled

25  exactly as Combe is arguing.  The TTAB originally said, "When

—Combe v. Wolff—

1   you're looking at third-party use, you need to consider sales

2   figures and advertising figures, otherwise, you don't consider

3   those."

4           The Federal Circuit said that's wrong.  When you

5   have a volume of third-party uses and registrations that's

6   significant, the fact that some of them don't have significant

7   sales yet doesn't matter.  It's the cumulative effect of all

8   of those third-party marks and registrations over the years

9   that matters.  And so that's what *Juice Generation* said and

10  that's the reasoning that should apply here.

11          And the number is significant here.  There are at

12  least currently 17 third-party uses of Vagi prefix marks and

13  16 registrations of Vagi prefix marks.  Over the years, there

14  have been many others.  The stipulated evidence includes at

15  least 22 examples of registrations that have since expired,

16  but existed prior to Combe's adoption, and some later, for

17  Vagi prefix marks.

18          Now, the second factor that the Fourth Circuit

19  considers, the similarity of the marks also weighs heavily in

20  Dr. Wolff's favor.  What the Fourth Circuit looks at are

21  sight, sound and meaning.  All three of those aspects favor

22  Wolff.

23          In sight, "san" is not similar to "sil."  The record

24  also shows that numerous Vagi followed by "S" marks have

25  coexisted with Vagisil, Vagistat and Vagi-Soothe.  So there's

Combe v. Wolff

452

1   no reason why Vagisan can't also coexist with Vagisil.

2            In sound, san and sil sound nothing alike as the

3   TTAB correctly found.  And in meaning, san refers -- is the

4   Latin term for health, as Ms. Thevessen testified, which has a

5   much different connotation than sil.

6            Now, in conducting a comparison of the marks, the

7   similarity of the marks, in the Fourth Circuit, Courts

8   followed the Pizzeria Uno factors, which examine the

9   marketplace use of the respective marks.  So the Court should

10  consider the Dr. Wolff packaging that's available in the U.S.

11  on Amazon.com.

12           But even if the Court doesn't do that and follows

13  the approach used by the TTAB, the outcome is the same.  If

14  the Court takes the approach espoused by TTAB, the Court will

15  look at the standard character application for Vagisan and

16  will presume that the mark could be displayed in the same

17  stylization as Vagisil.

18           That doesn't change the outcome because -- many

19  third parties are, in fact, using the same or very similar

20  stylization as Vagisil.  Now, Vagi-Soothe, Vagicaine, many

21  other products use a similar sans serif font.  There's nothing

22  particularly distinctive about the Vagisil font and many third

23  parties are using it.  So even if the Court uses that

24  analysis, the outcome is the same.

25           Third, the factor examining the degree of purchaser

Combe v. Wolff
453

1  care used to buy these products also weighs heavily in Wolff's

2  favor because the record shows that vaginal care products like

3  these are purchased with a great deal of care.

4       Now, the evidence shows that both parties have used

5  doctors as part of their marketing to promote their products,

6  and both parties go to great length to provide guidance on the

7  proper use of their products, including on their websites and

8  through other channels.

9       Now, for this appeal, Combe has invented a new

10 theory that these products are so-called grab-and-go products

11 that are not purchased with care.

12      Combe's new theory directly contradicts the evidence

13 in this case, including Combe's own admission at trial in the

14 TTAB proceeding.  During that trial, Combe's own witness,

15 Yolanda Payne, admitted that these products are, in fact,

16 purchased with care and this is what she said:

17      "Question:  Would you agree with me, Ms. Payne, that

18      women are careful in treating their own health, in

19      particular, intimate parts of their body?

20      "Answer:  For the most part, most women, yes.

21      "Question:  So would you agree with me that women

22      would, as an extension of that, be careful in the

23      selection of what products they would use to treat a

24      health issue, particularly one that is related to

25      intimate part of their body?

Combe v. Wolff
454

1       "Answer:  Yes."

2       So, Your Honor, the confusion factor examining the

3   degree of purchaser care also weighs heavily in Wolff's favor.

4       Next, Your Honor, the factors considering good faith

5   and lack of actual confusion clearly favor Wolff.  Wolff filed

6   this application in good faith to expand a developed brand, as

7   Ms. Thevessen testified.  It is a brand that's been used for

8   20 years.  And as explained by Ms. Thevessen, Wolff has no

9   desire whatsoever to trade on any good will that Combe may

10  have in the Vagisil mark.

11      In addition, the lack of actual confusion factor

12  favors Wolff because there is no such evidence in this case,

13  despite Vagisan being available in the United States on

14  Amazon.com since at least 2016, which is what the TTAB records

15  shows.

16      Now, Your Honor, Combe points to how Poret's survey is

17  to try to overcome the weaknesses in its case, but the Poret

18  surveys don't help Combe because they're defective and

19  entitled to no weight.

20      The first major flaw in both of Mr. Poret's surveys is

21  that they both used an improper control that artificially

22  inflated the response rates to favor Combe.  As explained by

23  Dr. Simonson, the purpose of a control in a survey is to count

24  for and subtract from the survey rate, error or noise.  And to

25  be valid, a control has to meet two tests.

1          First, it has to be plausible; and second, it has to

2    share as many characteristics as possible with the defendant's

3    mark except for the characteristic whose influence is being

4    tested.  So the characteristic whose influence is being tested

5    in this case is the suffix, "san."  Mr. Poret's controls

6    failed both of these tests.

7          First, the control from the fame survey, Vagizox,

8    isn't plausible because it's completely different than Vagisan

9    or any other mark on the market, most of which have a suffix

10   with a positive connotation, like soothe or tone or clear.

11   Zox has a negative connotation referring to toxin or

12   oxidation, which is undesirable for a vaginal care product.

13   The control Vagipur fails for similar reasons.  It's not close

14   enough to Vagisan.  What Mr. Poret should have done is used a

15   suffix that removes the "S" from the suffix, but keeps the

16   a-n.  This would have been consistent with survey science and

17   the case law because it would have been close enough to the

18   mark being tested, Vagisan, but would have removed a portion

19   from it, the "S."

20         Now, Your Honor, in the -- Mr. Poret has had surveys

21   given no weight for similar problems with controls.  One

22   example of this is the *Ducks Unlimited* case from the western

23   district of Tennessee.  And there, the Court gave no weight to

24   Mr. Poret's confusion survey because of a control issue.  Just

25   like here, the control that Mr. Poret used in that case wasn't

Combe v. Wolff

456

1   similar enough to the defendant's mark.  The two marks

2   involved there were duck head logos, but the duck head control

3   that Mr. Poret chose was not similar enough to the defendant's

4   actual duck logo, and thus, the Court gave the survey no

5   weight.

6        The same flaw exist here and for that same reason, Mr.

7   Poret's confusion survey here should be given no weight.

8        The second major defect in Mr. Poret's confusion

9   survey is his overcounting of responses to the why question in

10  the matter that skewed the results in Combe's favor.  And

11  courts emphasized that the answers to the why question in a

12  confusion survey are critical.  You only count answers to the

13  why question as indicative of confusion if they clearly show

14  confusion.

15       And this Court has recognized that principal in the

16  case *Teaching Company Partnership v. Unapix Entertainment*

17  which is a Judge Lee decision from the year 2000.  And in that

18  case, the court, in reviewing a survey, said, quote, "Often an

19  examination of the respondent's verbatim responses to the why

20  question are the most illuminating and probative part of a

21  survey, for they provide a window into consumer thought

22  processes in a way that mere statistical data cannot."

23  The Court went on to say that the experts' recalculation of

24  the responses in that case was defective because it gave equal

25  weight to reasons which clearly demonstrated actionable

Combe v. Wolff

457

1  confusion with responses that have nothing to do with

2  anything.  For example, both parties using a cut-out coupon in

3  an ad or an 800-number.

4        Here, Mr. Poret, likewise, improperly included many

5  responses in his calculation that were not indicative of

6  confusion, and this greatly and inaccurately inflated the net

7  confusion rate in Combe's favor.  So answers that Mr. Poret

8  improperly included, in response to the why question, were

9  things like:  Just sounds right, the V-a-g-i in Vagisan, both

10  start with Vagi.  Those answers and many others simply don't

11  reflect confusion, and thus, they shouldn't have been counted.

12  Now, if Mr. Poret had correctly removed those responses from

13  his survey tally, this would have reduced the net confusion

14  rate to 10 or 11 percent, Your Honor, which is not probative

15  of confusion.

16        The third major defect in Mr. Poret's confusion survey

17  was his failure to use a proper test stimulus, which should

18  have been the actual marketplace package of Vagisan, which is

19  available on Amazon.com.  It's true that in the TTAB case,

20  using an index card stimulus has, in some cases, been deemed

21  appropriate.  But that's not proper, Your Honor, once you

22  appeal to district court and the court is considering actual

23  marketplace use under the Pizzeria Uno factors.

24        Now, one example of this, Your Honor, was the

25  *Victoria's Secret* case from the southern district of New York,

458

1   which was a 1071(b) case only.  There was not infringement

2   claim there, and there, the Court considered a survey that was

3   done by an expert, Jerry Ford, which did look at a marketplace

4   stimulus.

5          And the *Seacret Spa* case, which Combe relies on is

6   distinguishable.  There was no survey in that case,

7   Your Honor.  The expert there did consider marketplace use,

8   which the Court said should be given no weight, but there was

9   no survey there.

10         So, Your Honor, the result of all three of these flaws

11  is that Mr. Poret's confusion survey is unreliable and should

12  be given no weight.  But, Your Honor, even if the Court does

13  decide to give Mr. Poret's confusion survey some weight, this

14  still isn't enough to tip the scales in Combe's favor, because

15  even under the best possible scenario for Combe, the net

16  confusion rate is still only 19 percent.  And courts have said

17  that any net confusion rate under 20 percent, courts regularly

18  give such a rate -- little weight in the likelihood of

19  confusion analysis.

20         And, for example, the *Bruce Lee* case from the southern

21  district of New York said figures below 20 percent become

22  problematic.  If you have a figure below 20 percent, the

23  survey evidence just becomes part of the overall mix.  And

24  here, it can't outweigh the balance of the likelihood of

25  confusion in Wolff's favor.

Combe v. Wolff

459

1          And, Your Honor, if the correct percentages applied,

2    11 -- which should be 10 or 11 percent, that's clearly not

3    enough to show confusion and is not probative of confusion.

4    And, for example, the *Georgia-Pacific* case, cited in our

5    conclusions of law, said that an 11.4 percent figure was too

6    low to be given any weight.

7          So in conclusion, Your Honor, because the likelihood

8    of confusion factors here weigh overwhelmingly in Dr. Wolff's

9    favor, we respectfully request that the TTAB's decision be

10   affirmed.  Thank you.

11         THE COURT:  All right.  I actually don't affirm a

12   decision.  I actually render a decision and it either agrees

13   with it or not.  I don't really affirm it, because it's de

14   novo as you both agree.

15         Thank you.  Illuminating arguments.  I was glad to

16   see that you both focussed on Pizzeria Uno factors.  You've

17   ticked them off one at the time, gave me your views on each

18   one.  Your divergence on foreign evidence was clear, and I'll

19   have to wrestle with that issue, as was your divergence on

20   whether in a survey in a 1071 case without infringement,

21   whether you should use the trade dress that you know about or

22   just what's on the registration.  That's another issue, which

23   I will have to deal with.

24         But all in all, your findings of fact and

25   conclusions of law are pretty consistent with what you've said

460

1    here today.  I think you mentioned some more authority today

2    than you had in your conclusions of law.

3          And in any event, it's been helpful.  Thank you for

4    your arguments.  I hope you feel as though you have been fully

5    heard.  I think you have.  And I will now have to undertake

6    the task of deciding whether or not the plaintiff has carried

7    its burden of showing that the mark shouldn't be -- should be

8    canceled in effect, because that's your remedy; am I right?

9          MR. PANKO:  That's right, Your Honor.

10         THE COURT:  Thank you for your argument.  I'll take

11   the matter under advisement and decide it.

12         What about all of this?  We're not going to keep

13   this.  I know what's been admitted.  I think what I will do is

14   we will be careful to look at what has been admitted.  At some

15   point in the not distant future, you'll receive a call from

16   the Clerk's office saying -- asking you to come and carry away

17   your exhibits.  We won't need -- we will, of course, keep

18   exhibits that were admitted and -- because they will be part

19   of the permanent court record.

20         All right.  You adhered to your timing pretty

21   closely for which I thank you.  Court stands in recess.

22

23              **(Proceedings adjourned at 3:35 p.m.)**

24

25

1          CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Bench Trial

7    in the case of the **COMBE INCORPORATED versus DR. AUGUST**

8    **WOLFF GMBH & CO. KG ARZNEIMITTEL,** Civil Action No.

9    1:17-CV-935, in said court on the 7th day of December,

10   2018.

11         I further certify that the foregoing 41 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, my computer realtime

14   display, together with the backup tape recording of said

15   proceedings to the best of my ability.

16         In witness whereof, I have hereto subscribed my

17   name, this December 11, 2018.

18

19

20

21                         Tonia M. Harris, RPR

22                         Official Court Reporter

23

24

25

461